UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A **16GB *MONSTER* FLASH DRIVE**, CURRENTLY LOCATED AT **119 D ST NE, WASHINGTON, DC 20510** | Misc. No. _____ |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Christopher Desrosiers, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, specifically a **16GB *MONSTER* FLASH DRIVE**, a digital device, which is currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.     I am a Special Agent (SA) with the United States Capitol Police (USCP), where I have served since February 2007.  I am currently assigned to the Investigations Division Threat Assessment Section.  My duties and responsibilities, among other things, include investigations into the stalking and harassment of Members of Congress.  I have attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received training and gained experience in search and arrest warrant applications, the executions of searches and seizures, computer crimes, computer evidence identification, computer evidence seizure and processing, and various other relevant training.  As a federal agent,

I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a **16GB *MONSTER* FLASH DRIVE**, hereinafter the "DEVICE."

5.      The DEVICE is currently located at **119 D STREET NE, WASHINGTON, DC 20510**.

## PROBABLE CAUSE

6.      On or about May 22, 2014, staff from the Washington, D.C. office of Congresswoman Kyrsten Sinema of Arizona contacted the United States Capitol Police (hereafter USCP) to report a series of social media messages (via Facebook), and telephone calls from OLAGUNJU.  Staff stated that in his communication, OLAGUNJU claimed to have a personal relationship with the Congresswoman.

7.      On or about August 26, 2014, the Congresswoman's staff contacted USCP to report that OLAGUNJU's contact had continued and increased in frequency since the original report. Staff reported that OLAGUNJU would express his love for the Congresswoman, reference their future together, and express his desire to meet with the Congresswoman in person.  Staff reported over 95 contacts from OLAGUNJU from June 2, 2014 through August 24, 2014.

8.      On or about October 14, 2014, the Congresswoman's staff contacted USCP to report that OLAGUNJU had sent the Congresswoman's AZ campaign office a letter including flight information referencing OLAGUNJU travelling to AZ.

9.      On or about October 14, 2014, a USCP Agent made contact with OLAGUNJU via telephone to discuss OLAGUNJU's attempts at contact with the Congresswoman and his reasons for providing his flight information to the Congressional office and contributing to the Congresswoman's campaign. OLAGUNJU stated that he wanted to help the Congresswoman and further stated he was a member of the Congresswoman's "team". OLAGUNJU was told by the USCP Agent that his contact with the office was unwanted, and that he was not a member of the Congresswoman's "team".

10.     On or about January 16, 2015, OLAGUNJU posted the following message on the Congresswoman's Facebook page:

> "How are you doing this beautiful Day? I will be in Washington next month and I would like to stop by and see your new and beautiful office. If you don't mind. Maybe we can have dinner together in a small diner if you want. At least for the first time and go watch movie called "Sema" together. If it is fine with you, please let me know. Ok. Amos"

11.     On or about January 20, 2015, OLAGUNJU posted the following message on the Congresswoman's Facebook page:

> "My only one, are you back in Washington? Do you dress warm? It is very cold. I will be watching the president tomorrow by 9:00PM. And I will see you too with the rest Congress. Also by February we shall see each other

facially.  How great shall it be, I can not wait to see your face.  I love you so

dearly.  Good Night dear. Amos"

12.     On or about January 22, 2015, a USCP Agent made contact with OLAGUNJU via

telephone and explained to OLAGUNJU that his messages to the Congresswoman were in

appropriate and unwanted, and needed to cease.  The Agent further stated to OLAGUNJU that he

would not be able to meet with the Congresswoman if he travelled to Washington, D.C.

OLAGUNJU stated that he understood.

13.     On or about March 25, 2015, staff from the PHOENIX, AZ district office of the

Congresswoman contacted USCP to report that OLAGUNJU had left the office three voicemail

messages, stating that he was currently staying at a local hotel in AZ.  During one of the messages,

OLAGUNJU provided a phone number for a hotel located in Phoenix, AZ.

14.     On or about March 26, 2015, the Congresswoman's staff reported to USCP that

OLAGUNJU had sent an RSVP via Facebook for an event the Congresswoman was having on

March 27, 2015, in Arcadia, AZ.

15.     On or about March 27, 2015, a USCP Agent again contacted OLAGUNJU via

telephone and reiterated that OLAGUNJU's contacts were unwanted.

16.     On or about June 1, 2015, OLAGUNJU sent the following email to the

Congresswoman via her press email account:

My Love & My life.  Do you see my tape?  If so do you like it or not?  Please

let me know.  This is June 1st_Am I coming this Month?  According to our

plan.  I will never let you down or disappoint you; by the special grace of God

Almighty [KS] my love; my life & my blonde, I love you with my heart and

my soul.  I am waiting for your respond.  If you are still doubting, please let

me know.  Ask me any question please thank your husband to be, Amos"

17.     On or about December 30, 2015, OLAGUNJU sent the Congresswoman an email
stating that he had purchased a flight from New York, NY to Phoenix, AZ to see the
Congresswoman.  USCP Agents contacted the City of New York Police Department (NYPD) who
verified the flight arrangements and made contact with OLAGUNJU and subsequently arrested
him for outstanding traffic offenses.

18.     On or about March 4, 2016, the Congresswoman obtained an injunction in the
Chandler, AZ Municipal Court ordering that OLAGUNJU was to have no contact with KS.  The
Injunction was served on OLAGUNJU by the Phoenix Police Department and was scheduled to
expire a year after it was issued.

19.     On or about April 22, 2016, OLAGUNJU showed up at an event in Chandler, AZ,
that the Congresswoman was attending.  Staff removed the Congresswoman from the event and
contacted local police.   Local police arrested OLAGUNJU for violation of the injunction.
OLAGUNJU was sentenced to 11 months' probation and was allowed to leave the state to return
to NY with his brother.

20.     On or about May 1, 2017, after the expiration of the first protective order, the
Congresswoman's staff reported that OLAGUNJU had made contact again with their office when
he tried to sign up to be a volunteer.

21.     On or about July 6, 2017, the Congresswoman obtained a second injunction against
OLAGUNJU in the City of Phoenix, AZ Municipal Court, again ordering that OLAGUNJU was
to have no contact with KS.

22.     On or about July 9, 2017, I was present when members of the NYPD served OLAGUNJU with the 2017 injunction at his residence located in Brooklyn, NY.

23.     On or about July 25, 2017, the Congresswoman's staff reported to USCP that their campaign office had just received a package from OLAGUNJU which included a letter and a photocopy of the injunction order.  The letter mentioned a person named "Williams", which was an apparent reference to a USCP Special Agent who had previously made contact with the defendant.  In the letter, OLAGUNJU wrote the following:

> "Also last Sunday morning, some people know (sic) the front of our house, I went to open the door, it was the police officers from Williams "again".  I am sending these copies to you, so you can read them, and let me know your thoughts before I say anything.  I don't want you to "call him".  This man Williams is in serious trouble with Almighty God, but please pretend you don't know or see anything.  The Bible says the "The Battle is for the Lord, he taught is fighting us, but not us, he is fighting the "Host of heaven, and Jesus Christ.  Let us see what will happen, maybe he can beat the Almighty God, "we shall see."  I want you to read them over."  I love you more than ever.  I am seriously in love with you.  Take care of my job, so I can travel to San Francisco and meet you there, and start my job."  My lovely partner, and my "WIFE".  Thanks.  Your's in love Amos."

24.     On or about August 24, 2017, the Congresswoman's staff reported to USCP that their campaign office had received another mailing from OLAGUNJU.  In the multi-page letter, OLAGUNJU wrote:

> "Hi Darling love, Good day to you.  How are you doing in AZ you did not call
> me.  Why are you so far to me?  When will I see your face sitting by my side.
> Why are you entangled yourself in many things, that's why you've know time
> for me, how can we plan our future together as one.  Many things you're doing
> yourself where is your phone call to me.  I enclose the building plans for you.
> This is the house I am building for you in Ejigbo, near Ibadan, of (sic) State of
> Nigeria for you.  The night you agreed to be my my wife, telling me "your're
> in love with me, that night I decided to build you a house, bought you a land
> and the house have started."  (with the letter, OLAGUNJU included copies of
> what appear to be blueprints for a house)

25.     On or about September 11, 2017, the Congresswoman's staff reported to USCP that
OLAGUNJU had sent the following Facebook message to the Congresswoman, via her Veterans
for [KS] Facebook page:

> "Darling, the wedding gown, I love that, It is so moderate, beautiful, I want
> you to have it, You'll have when I see you less than two weeks.  Love."

26.     On or about October 12, 2017, the Congresswoman's staff reported to USCP that
their Washington, D.C. office had received a mailing from OLAGUNJU, which included a letter
and a copy of the 2017 injunction.  The letter included the following statements:

> "About us, we're determined to marry each other, nothing can change that or
> delay us for living together.  Two years ago, you told me to ship all my
> belongings to you which I did, before problems started with Williams and your

staffs.  I told you before that I would be a father of your children taking good

care of them, and you a great husband till the end of my life."

27.     On or about November 15, 2017, the Congresswoman's staff reported to USCP that

OLAGUNJU contacted their Washington, D.C. office via telephone, and requested to speak with

the Congresswoman.  The request was denied and the call was terminated.

28.     On or about January 12, 2018, staff from the Congresswoman's Washington, D.C.

office contacted USCP to report that OLAGUNJU had arrived in-person at their office, and stated

that he had a meeting with the Congresswoman.   USCP Officers responded to the office

immediately, and OLAGUNJU was subsequently arrested for violating the injunction order.  I am

aware that, prior to arrest, the arresting officer contacted authorities in Phoenix, AZ, and confirmed

that the 2017 injunction remained in force.

29.     On or about January 12, 2018, at the time of arrest OLAGUNJU was in possession

of the DEVICE within his personal property, which was held for safe keeping at USCP

headquarters during prisoner processing.  The DEVICE was recovered by USCP Agents pursuant

to a search warrant of that personal property on February 12, 2018, and placed into evidence.

30.     On or about January 12, 2018, OLAGUNJU stated to your affiant that on or about

January 11, 2018, he and the Congresswoman exchanged emails for approximately 2 hours.

OLAGUNJU further stated the Congresswoman told him to travel to Washington D.C. to train for

a job with her office.   As stated above, OLAGUNJU has previously to mailed items to the

Congresswoman, including blueprints for a proposed house overseas. Given OLAGUNJU's

statements regarding the purpose of his travel, as well as his communication with the

Congresswoman regarding job training for a position in the Congressional office and his history

of mailings to the Congresswoman, I submit that OLAGUNJU likely carried information in the DEVICE that would further detail his travel and prior contact with the Congresswoman.

31.     The DEVICE is currently in the lawful possession of the USCP and stored at 119 D Street N.E. Washington, D.C.

32.     On January 18, 2018, an indictment was returned charging OLAGUNJU with one count of stalking, in violation of 18 U.S.C. § 2261A(1)(B), and one count of interstate violation of a protection order, in violation of 18 U.S.C. § 2262(a)(1). This indictment is pending in case no. 1:18-cr-00011-JDB.

## TECHNICAL TERMS

33.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.

These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

      d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant

client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address

identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

          i.        When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

          ii.        Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

          o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.   This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

34.     Based on my training, experience, and research, I know that the DEVICE has capabilities that allow it to serve as a digital storage medium. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment B, this application seeks permission to search for information that might be found within the DEVICE.  Based on my knowledge, training,

and experience, as well as information related to me by Agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the DEVICE for at least the following reasons:

a. Individuals who engage in criminal activity, including 18 U.S.C. 2261A(1)(B) and 2262(a)(1), may use digital devices, like the DEVICE, to facilitate illegal activity, to store on digital devices, like the DEVICE, documents and records relating to their illegal activity, which can include logs of online "chats", email correspondence; text or other "short Message Service" ("SMS") messages; contact information, including telephone numbers, email addresses, identifiers for instant messages and social media accounts.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in

free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

36.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the DEVICE at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who

has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the DEVICE are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the DEVICE, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs,

photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

   c.  A person with appropriate familiarity with how digital storage media works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e.  Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

   f.  I know that when an individual uses a digital device to commit Interstate Stalking, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an

instrumentality of the crime because it is used as a means of committing the criminal offense.  The

digital device is also likely to be a storage medium for evidence of crime.  From my training and

experience, I believe that a digital device used to commit a crime of this type may contain data

that is evidence of how the digital device was used; data that was sent or received; notes as to how

the criminal conduct was achieved; records of Internet discussions about the crime; and other

records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

37.     Based on my knowledge, training, and experience, as well as information related to

me by Agents and others involved in this investigation and in the forensic examination of digital

devices, I know that:

a.     Searching digital devices can be an extremely technical process, often

requiring specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today.  Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage devices –

may be customized with a vast array of software applications, each generating a particular form of

information or records and each often requiring unique forensic tools, techniques, and expertise.

As a result, it may be necessary to consult with specially trained personnel who have specific

expertise in the types of digital devices, operating systems, or software applications that are being

searched, and to obtain specialized hardware and software solutions to meet the needs of a

particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional

modification or destruction.  Searching digital devices can require the use of precise, scientific

procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

        c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting

innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

       e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated

encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

      f.     Based on all of the foregoing, I respectfully submit that searching the DEVICE for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

      g.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      The DEVICE, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the DEVICE may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the DEVICE, the forensic examiners may examine as much of the contents of the DEVICE as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the DEVICE will be specifically chosen to identify the specific items to be seized under this warrant.

**AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

38.     Because forensic examiners will be conducting their search of the DEVICE in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

**CONCLUSION**

39.     I respectfully submit that this affidavit supports probable cause for a warrant to search the **16GB *MONSTER* FLASH DRIVE** described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

_____

Christopher Desrosiers, Special Agent
United States Capitol Police

Subscribed and sworn to before me on March 8, 2018:

_____

UNITED STATES MAGISTRATE JUDGE